# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

MICHAEL LEE WILSON,                      )
                                         )
                    Petitioner,          )
                                         )
v.                                       )        Case No.  00-CV-0147-CVE-FHM
                                         )
RANDALL G. WORKMAN, Warden,              )
Oklahoma State Penitentiary,             )
                                         )
                    Respondent.          )

## OPINION AND ORDER

This is a 28 U.S.C. § 2254 proceeding. Petitioner Michael Lee Wilson is in custody on

Oklahoma's death row. This matter comes before the Court on remand from the Tenth Circuit Court

of Appeals for further proceedings and an evidentiary hearing consistent with its August 27, 2009,

opinion. See Wilson v. Workman, 577 F.3d 1284, 1300 (10th Cir. 2009) (en banc) (reinstating panel

decision in Wilson v. Sirmons, 536 F.3d 1064, 1123 (10th Cir. 2008)). Also before the Court is

Wilson's motion to expand the record to include an affidavit of attorney James C. Bowen, as

attached to his brief. See Dkt. # 81 and Dkt. # 80, attachment 1. No objection was filed to Wilson's

motion. The Court finds that Wilson's motion (Dkt. # 81) should be granted. For the reasons stated

below, however, the Court finds that Wilson has not demonstrated that he is entitled to habeas

corpus relief on the ineffective assistance of counsel claim considered upon remand from the Tenth

Circuit.

## BACKGROUND

### I.    Factual history

In resolving Wilson's direct appeal, the Oklahoma Court of Criminal Appeals (OCCA)

provided a summary of the facts underlying Wilson's conviction. Wilson v. Oklahoma, 983 P.2d 448

(Okla. Crim. App. 1999). In the absence of clear and convincing rebuttal evidence, that factual summary is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). A review of the factual background resulting in Wilson's conviction provides assistance in resolving the issues currently before the Court. The OCCA summarized the facts as follows:

> Michael Wilson and Richard Yost were employees at the QuikTrip convenience store located at 215 North Garnett Road in Tulsa, Oklahoma. Wilson and his friends planned to rob the convenience store at least two weeks before this crime actually occurred. The plan commenced on February 25, 1995. Wilson had completed his shift at 11:00 p.m. with Yost beginning his shift at that time. Wilson and his three friends came into the store during the early morning hours of February 26 and waited for the most opportune time to accost Yost. The QuikTrip surveillance camera captured the events as they unfolded. The video of the events is quite telling.

> Yost was cleaning the windows on the coolers with Wilson and the codefendants surrounding him. As Yost was walking near a passage way to the back room, all four defendants attacked him and dragged him to the back room. One of the defendants, identified as Billy Alverson, came back out and picked up some items that were knocked from the shelves and kept watch for customers. A few moments later, Alverson and Richard Harjo walked out the front door of the store. While they were going out, Yost was yelling and screaming for help, possibly thinking that a customer had entered the store. Alverson and Harjo re-entered the store with Harjo carrying a black aluminum baseball bat. He carried the bat to where Yost had been taken. The surveillance camera picked up the sounds of the bat striking Yost. Circumstantial evidence showed that the baseball bat struck the handcuffs on Yost's wrists which Yost was holding above his head to ward off the blows. As the blows were being struck, Wilson walked from the back room, checked his hands, put on a QuikTrip jacket, got behind the counter and tried to move the safe. While Wilson was behind the counter, several customers came in. Wilson greeted them with a friendly greeting, sold them merchandise, then said "thank you, come again" or "have a nice day."

> All this time Wilson continued to try and pull the safe from underneath the counter. He took money from the cash drawer and pulled money out of the currency change machine. At some point after this, Wilson left the counter area and took the video from [the] surveillance camera recorder. The defendants then loaded the safes into Wilson's car using a dolly from QuikTrip.

> Yost's body was discovered by Larry Wiseman, a customer, at about 6:00 a.m. Yost was laying on the floor in a pool of blood, milk and beer. Yost's ankles were taped together with duct tape. One handcuff was found near Yost's body. The

2

other cuff was missing from the scene. Detectives learned that Wilson was at the store between the hours of 4:00 a.m. and 6:00 a.m.

Wilson failed to show up for work at the scheduled time of 3:00 p.m. on the same day. Officer Allen set up surveillance on Wilson's house and at about 4:00 p.m. he spotted Wilson get into a gray vehicle. The vehicle was stopped. Wilson was taken into custody. Also arrested were the other occupants in the vehicle: codefendants Alverson, Harjo, and Darwin Brown. Large sums of money were recovered from all of the defendants except Wilson.

Wilson was questioned by Detective Folks. He told Folks that they planned on robbing the QuikTrip and that he knew Yost would be killed. He said that they had been talking about the robbery for about two weeks. The plan was for him to assume the role of sales clerk once Yost was "taken care of."

Officers searched Alverson's place of abode where they discovered the drop safe, the dolly, QuikTrip glass cleaner, money tubes and the store surveillance video tape. A search was conducted of Wilson's house but nothing of value was discovered. The next day Wilson's mother called Officer Makinson to come to her house. Once there, the detectives found several items of evidence on the front porch, including the baseball bat, a bloody QuikTrip jacket with Yost's name on it, Wilson's Nike jacket matching the one worn in the store video and the other cuff of the set of handcuffs.

Wilson, 983 P.2d at 455. The Tenth Circuit also relied on the OCCA's factual findings in its summary of the crime. Wilson, 536 F.3d at 1071.

## II.     Procedural history

Wilson was convicted by a jury of First Degree Murder and Robbery with a Dangerous Weapon in Tulsa County District Court Case No. CF-95-1024. His trial was held jointly with co-defendant Darwin Brown's trial, but before separate juries. Wilson was represented at trial by attorneys Joe P. Robertson and Kent R. Hudson.

Wilson's trial began with jury selection on February 3, 1997. The first stage concluded on February 14, 1997, with guilty verdicts on both counts. The second stage began on February 18, 1997, and concluded on February 20, 1997, with the imposition of a sentence of death for the first

degree murder count and life in prison for robbery with a dangerous weapon. The jury found the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Wilson was formally sentenced by the trial judge on April 9, 1997.

Wilson appealed his convictions and sentences to the OCCA in Case No. F-97-491. The OCCA affirmed Wilson's first degree murder conviction and death sentence in a published decision dated December 31, 1998. The judgment and sentence for robbery with a dangerous weapon was reversed and remanded to the district court for dismissal. Wilson's subsequent petition for writ of certiorari to the United States Supreme Court was denied on October 4, 1999. See Wilson v. Oklahoma, 528 U.S. 904 (1999). Wilson sought post-conviction relief from the OCCA in Case No. PC-98-1250, but all requested relief was denied in an unpublished opinion dated November 15, 1999.

Wilson next filed the instant habeas corpus proceeding, seeking relief on twenty-one (21) grounds. He also requested an evidentiary hearing to support his claims. On August 8, 2006, this Court denied habeas relief to Wilson and denied his request for an evidentiary hearing (Dkt. # 29). Thereafter, Wilson appealed to the Tenth Circuit Court of Appeals. A divided panel of the appellate court affirmed this Court's denial of habeas corpus relief, with the exception of one ineffective assistance of trial counsel claim. See Wilson v. Sirmons, 536 F.3d 1064, 1123 (10th Cir. 2008). The panel vacated the denial of Wilson's claim concerning trial counsel's alleged "failure to adequately prepare his mental health expert," or "make use of all mitigating information about Petitioner's

mental state." Id. at 1123, 1074. Significantly, the appellate panel did not direct the District Court

to grant relief on this claim, but remanded for further proceedings, including an evidentiary hearing.

Id. at 1096, 1123. Respondent sought en banc review of the panel decision regarding the ineffective

assistance of counsel claim, which the Tenth Circuit granted. Wilson v. Sirmons, 549 F.3d 1267

(10th Cir. 2008). The en banc Court concluded the panel decision was correct,[1] and reinstated the

decision. Wilson v. Workman, 577 F.3d 1284, 1287 (10th Cir. 2009). Accordingly, the case was

remanded to this Court for further consideration of the one ineffective assistance of trial counsel

claim. On February 5, 2010, a status and scheduling conference was held before the undersigned

---

[1]     The Tenth Circuit granted rehearing en banc "to determine whether to accord deference to decisions of the Oklahoma state courts on claims of ineffective assistance of counsel under 28 U.S.C. § 2254 where those claims are based on evidence that was not part of the original trial court record and where the state court declined to supplement the record with the proffered evidence, based on Oklahoma Appellate Rule 3.11(B)(3)(b)." Wilson v. Workman, 577 F.3d 1284, 1286 (10th Cir. 2009). The issue was whether the OCCA's decision was an adjudication on the merits warranting deference. The decision of the original panel held that the OCCA's decision was not entitled to deference. Wilson v. Sirmons, 536 F.3d 1064, 1079-1083 (10th Cir. 2008). The en banc Court concluded that the panel decision was correct. Based on the en banc ruling, this Court has reviewed the ineffective assistance of counsel issue de novo after conducting an evidentiary hearing. However, as the Respondent has pointed out in his brief (Dkt. # 83), the OCCA has recently explained the interplay between Rule 3.11 and the Strickland standard, stating: "[W]hen we review and deny a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we necessarily make the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in Strickland." Simpson v. State of Oklahoma, 230 P.3d 888, 906 (Okla. Crim. App. 2010). The OCCA also confirmed that, in making a decision on whether to grant an evidentiary hearing under Rule 3.11, the rules require the court to thoroughly examine the non-record evidence in order to evaluate the request. Id. at 905.  The OCCA's explanation of its review process when non-record evidence has been provided was not available when Wilson's habeas corpus appeal was being decided by the Circuit. However, it lends support to this Court's earlier conclusion that the OCCA's resolution of the ineffective assistance of counsel claim was a decision on the merits and entitled to deference for § 2254 review purposes. See Dkt. # 29 at 67-69.

5

(Dkt. # 49). The parties were allowed discovery, and an evidentiary hearing was held on July 28, 2010. Post-hearing briefing has been completed (Dkt. ## 80, 83, 86).

Wilson presented the testimony of three witnesses at the evidentiary hearing: A. Eugene Reynolds, Ph.D., attorney Joe Paul Robertson, and attorney Kent Hudson. Respondent did not present any witnesses, but did cross-examine each of Wilson's witnesses. Both parties presented oral argument. A transcript of the evidentiary hearing has been filed of record (Dkt. # 79). Pursuant to the Court's order, see Dkt. # 76, the parties were directed to brief the ineffective assistance of counsel claim following the evidentiary hearing. Wilson filed his opening brief on October 15, 2010 (Dkt. # 80), followed by respondent's response on November 12, 2010 (Dkt. # 83), and Wilson's reply on November 30, 2010 (Dkt. # 86). In addition to testimony of the three witnesses, Wilson presented numerous exhibits and affidavits in support of his ineffective assistance of counsel claim. The Court has considered all of this information and evidence in deciding the claim.

## ISSUES AND STANDARD

The issue before the Court is whether Wilson's trial counsel was constitutionally ineffective because of poor investigation in preparation for the sentencing phase and failure to present relevant mitigating evidence. More specifically, Wilson argues that: (1) counsel hired mental health expert, Dr. Reynolds, only three weeks before trial and met with him only two days before his testimony; (2) Dr. Reynolds was not allowed sufficient time to conduct testing necessary to confirm his later (post-trial) diagnosis of schizophrenia; (3) the delay prevented the defense team from providing Dr. Reynolds with collateral information to support his diagnosis; (4) counsel failed to gather adequate information from family members; (5) counsel failed to present the diagnosis Dr. Reynolds had made - instead focusing the mitigation strategy on Wilson's high intelligence and capacity for

reform. Respondent contends that review of the evidence presented at the evidentiary hearing shows that trial counsel was not constitutionally ineffective.

Trial counsel's performance must be evaluated under the familiar two-part standard announced in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Wilson must satisfy both prongs of the two-part test to prevail. He must show that counsel's performance was deficient, and that the deficient performance prejudiced his defense. <u>Id.</u> at 687.

To satisfy the deficient performance prong, Wilson must demonstrate that his attorney's performance fell below an objective standard of reasonableness. "In assessing [trial] counsel's investigation" of available mitigating evidence in a capital case, this Court "must conduct an objective review of [defense counsel's] performance, measured for 'reasonableness under prevailing professional norms. . . .'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003). According to the Supreme Court, those prevailing standards include consideration of the ABA Guidelines for the Appointment

and Performance of Counsel in Death Penalty Cases (ABA Guidelines).[2] Under the ABA Guidelines, "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" <u>Id.</u> (quoting 1989 version of ABA Guidelines).  However, the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct" and has emphasized that the "proper measurement of attorney performance remains simply reasonableness under prevailing professional norms." <u>Id.</u> at 521 (quoting <u>Strickland</u>, 466 U.S. at 688). There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." <u>Stickland.</u> 466 at 688.  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Id.</u> at 690.  Moreover, review of counsel's performance must be highly

---

[2]    In light of Wilson's heavy reliance on the 1989 version of the ABA Guidelines, the Court finds the following comments by Justice Alito in a 2009 concurring opinion to be instructive:

> I join the court's *per curium* opinion but emphasize my understanding that the opinion in no way suggests that the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) (2003 Guideline or ABA Guideline) have special relevance in determining whether an attorney's performance meets the standard required by the Sixth Amendment. The ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership. The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole. It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination.

<u>Bobby v. Van Hook</u>, 130 S. Ct. 13, 20 (2009) (Justice Alito, concurring opinion).

deferential. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.

To establish prejudice under the Strickland standard, Wilson must show that there is "a reasonable probability that, absent [counsel's] errors, the sentencer - including an appellate court, to the extent it independently reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Keeping these principles in mind, the Court must now determine whether counsel's performance at the mitigation phase of Wilson's trial was both deficient and prejudicial under Strickland. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010) (as in original). As recently noted by the Supreme Court:

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.,* at 689, 104 S.Ct. 2052; see also *Bell v. Cone,* 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

Harrington v. Richter, 131 S. Ct. 770, 788 (2011). Under Strickland, Wilson bears the burden of satisfying the two-part test in order to prevail.

## ANALYSIS

### I.     Deficient performance

This is not a case where trial counsel did little or nothing in preparation and presentation of Wilson's mitigation case before the jury. In fact, the Tenth Circuit noted, "This is a closer case than some, because defense counsel did hire an appropriate expert, provide some background information, and present some of the expert's findings to the jury." Wilson, 536 F.3d at 1074. Because a majority in the Circuit's panel decision did not conclude counsel's performance was deficient, the issue is before this Court following the evidentiary hearing. In considering whether counsel's performance was constitutionally deficient, it is necessary to review both the second stage evidence actually presented, and the additional evidence Wilson argues should have been discovered and presented to the jury.

### A.     Second stage trial

#### 1. Prosecution

The sentencing phase of Wilson's trial began on February 18, 1997.  In his opening statement, the prosecutor explained that the state had the burden of proving beyond a reasonable doubt the aggravating circumstances associated with the murder, namely: the murder was especially heinous, atrocious, and cruel, under OKLA. STAT. tit. 21, § 701.12(4); the murder was committed for the purpose of avoiding or preventing a lawful arrest and prosecution, under OKLA. STAT. tit. 21, § 701.12(5); and the existence of a probability that Wilson would commit criminal acts of violence that would constitute a continuing threat to society, under OKLA. STAT. tit. 21, § 701.12(6).  Feb. 18, 1997 Tr. at 23-24.  The defense reserved its opening statement at the beginning of the sentencing

phase.  Id. at 29.  The state's motion to incorporate all of the evidence from the guilt phase of Wilson's trial was granted.  Id. at 29-30.

The state's first witness was Sergeant Mike Huff, a City of Tulsa police officer.  Id. at 30-32. Huff testified that he was involved in the investigation of a fatal drive-by shooting of Karen Summers that took place September 10, 1994.  Id.  Huff made contact with Wilson on September 11, 1994, because it was known that Wilson was driving a vehicle that matched the description of the vehicle used in the Summers homicide.  Id. at 33.  Huff and another officer, Harold Goad, followed Wilson into his home because Wilson wanted to make a telephone call to his mother and change his shoes.  Id. at 34.  As Wilson was sitting on the bed changing his shoes, Huff observed Wilson doing something underneath the long shirt that he was wearing.  Id. at 34.  As Wilson got up, Huff observed Wilson attempting to slide a handgun underneath the bed sheets.  Id.  After Wilson got up, Huff was able to see the silhouette of a handgun partially under the sheets.  Id. at 35. Huff recovered the handgun and then transported Wilson to the Tulsa Police Detective Division. Id.  The handgun was a .380 caliber Lorcin semiautomatic, serial number 102039.  Id.  Defense counsel cross-examined Huff.  Huff stated that another person had since been convicted of the killing of Karen Summers.  Id. at 36.  Huff admitted that the first time he knew the object was a gun was when he saw the silhouette under the sheets.  Id. at 37.

The state's second witness was Sergeant Gary Meek, a City of Tulsa police officer.  Id. at 39-40.  Meek was the lead investigator in the Karen Summers case.  Id. at 41.  Meek came into contact with Wilson on September 11, 1994 when Huff brought Wilson to the Detective Division. Id. at 42.  Meek questioned Wilson regarding the Karen Summers homicide.  Id. at 42-43.  Meek testified that Wilson admitted that, at approximately 1:30 a.m. on September 10, 1994, he provided

some .380 caliber ammunition to DeMarco Carpenter, one of the men convicted in the case. Id. at 44-45. Meek asked Wilson why he was carrying the handgun that Huff found. Meek testified that Wilson stated he was carrying it for protection. Id. at 45. Meek testified that, at a subsequent interview at the district attorney's office on November 4, 1994, Wilson said that he was asked to hold the gun for DeMarco Carpenter. Id. at 46-47. Wilson had an attorney present at that interview. Id. Wilson's counsel cross-examined Meek. Id. at 47. Meek admitted that he was aware that, on a previous occasion, Wilson had been shot in another neighborhood of north Tulsa. Id. at 48. Meek stated that Wilson told him that someone had given him the gun after the killing of Karen Summers. Id. at 50.

The state's third witness was Sergeant Samuel McCullough, a City of Tulsa police officer. Id. at 51. McCullough testified that he came into contact with Wilson on February 16, 1995, when he was on patrol. He stopped a car driven by Wilson for driving over 50 miles per hour in a 35 mile per hour zone. Id. at 52-53. Darwin Brown was the only passenger in the car. Id. at 52-53. McCullough testified that Wilson stated he had been arrested in a double homicide in October 1994, and that he was awaiting sentencing on the charge of accessory to murder. Id. at 54. McCullough asked to search the vehicle, and Wilson consented. As Brown exited the vehicle, McCullough observed an aluminum baseball bat lying between the two front seats. He also found a loaded .25 caliber automatic pistol under the passenger seat. Id. at 56. McCullough arrested both Wilson and Brown. Id. at 57. Defense counsel cross-examined McCullough. Id. at 58. McCullough agreed that Wilson had told him that there were no firearms in the vehicle, and that the gun was found under the passenger seat, where Brown was sitting. Id. at 59.

The state's fourth witness was Victor Regalado,[3] a City of Tulsa police officer. Id. at 62-63. Regalado assisted McCullough with the traffic stop of Wilson on February 16, 1995. Id. at 64. Regalado identified the pistol recovered from Wilson's vehicle. Id. at 67. Wilson's counsel cross-examined Regalado. Id. at 68. Regalado stated that, to his knowledge, Wilson's fingerprints were not on the weapon. Id. at 69.

The court and counsel had a discussion outside the presence of the jury regarding the admissibility of various photographs showing blood spatter from the crime scene. Id. at 75-78. The court also determined that expert blood spatter testimony (particularly, regarding the difference between blood from wounds and blood cast off from the baseball bat) was inadmissible without the state notifying defense counsel of it and giving the defense an opportunity for discovery. Id. at 82. The court also ruled that an enhanced version of the security videotape of the murder (on which the pings of the bat and the victim's moans were more audible than on the original video) could not be played for the jury.[4] Id. at 89.

The state again moved to incorporate all evidence from the first phase of the trial as to the aggravating circumstances of avoiding arrest and especially heinous, atrocious and cruel, which was granted. Id. at 102.

The state's fifth witness was Detective Douglas Noordyke, of the Tulsa Police Department. Id. at 103-04. Noordyke had been with the scientific investigations unit for the prior seven years. Id. at 105. Noordyke was called to process the murder scene on February 26, 1995. Id. at 106.

---

[3]     The trial transcript incorrectly refers to him as "Regalato. "

[4]     The enhanced tape was introduced for appellate review by the Oklahoma Court of Criminal Appeals. Tr. at 98.

Noordyke did a video documentation of the crime scene.  Id. at 107.  Noordyke stated that he observed blood on the shelves, ceiling, and on the floor of the walk-in cooler at the QuikTrip.  Id. at 108.  He stated that he saw blood that appeared to have been swiped on the floor, drops of blood on the ceiling, on the floor, and on the merchandise, and some pools of blood on the floor.  Id. at 109.  He also described what was depicted in photographs of the victim and the crime scene, particularly where blood was located.  Id. at 110-14.  Noordyke narrated the video he took of the crime scene as it was shown to the jury.[5]  Id. at 212-27.  Wilson's counsel did not cross-examine Noordyke.  Id. at 127.

The state's sixth witness was Ronald F. Distefano, D.O.  Id. at 132-33.  Dr. Distefano is an expert in forensic pathology and anatomical pathology.  Id. at 133.  Dr. Distefano testified about photographs of the victim's body and the injuries they depicted.  Among other things, Distefano testified that a hinge fracture on the victim's head demonstrated that a massive force was applied to the head.  Id. at 142.  He also testified as to a diagram he made showing the contusions resulting from blows on the victim's body: on the back, in the shoulder region, on the left side, the elbow region, back of the left leg, the knee, shin, and upper lateral right thigh area.  Id. at 143-44.  Distefano also testified that, based on looking at the body after death, multiple blows were inflicted on a living individual.  Id. at 146.  However, he could not conclusively determine which blow was first, and whether the victim suffered before his death because any one of the blows might have been sufficient to render the victim unconscious.  Id. at 146, 150.  Distefano testified that, in his opinion, it was likely that injuries to the victim's finger (the wedding ring was bent) occurred when a blunt

---

[5]  In addition to describing the various locations where blood was found, Noordyke stated that the video depicted what appeared to be pry marks and a broken lock on the box housing the VCR for security videos.  Feb. 18, 1997 Tr. at 126.

object was brought down on the victim's head many times while the victim's hand was between the object and his head. <u>Id.</u> at 153. Based on this, Distefano concluded that these were probably defensive wounds. <u>Id.</u> at 154. He also concluded that handcuffs were probably interposed between the victim's head and the blunt object that struck his head. <u>Id.</u> at 159. Distefano estimated that a minimum of twenty blows were delivered to the victim's head, torso, and extremities. <u>Id.</u> at 159. It was Dr. Distefano's opinion that the victim would have suffered by being beaten with a metal baseball bat. <u>Id.</u> at 163.

Wilson's counsel cross-examined Dr. Distefano. <u>Id.</u> at 163. Counsel emphasized, and Distefano agreed, that the first blow could have rendered the victim unconscious. <u>Id.</u> at 163. Distefano also agreed that it could be presumed that the victim suffered until he was rendered unconscious. <u>Id.</u>

The state next called Angela Yost. <u>Id.</u> at 164. Yost was the victim's wife. Yost read her victim impact statement. <u>Id.</u> at 165. Wilson's counsel did not cross-examine her. <u>Id.</u> at 168.

The state next called Alma Dorn. <u>Id.</u> at 169. Dorn was the victim's mother. She read her victim impact statement. <u>Id.</u> at 170. Wilson's counsel did not cross-examine Dorn. <u>Id.</u> at 172, 177-78. The state rested. <u>Id.</u> at 173.

### 2. Defense

Attorney Hudson made an opening statement on Wilson's behalf. Feb. 19, 1997 Tr. at 3. He told the jury that the lay witnesses he would call might be "scared" or nervous. <u>Id.</u> at 5. Further, he implored the jury to listen to all the evidence and focus on the appropriate punishment, rather than guilt. <u>Id.</u> at 5.

Wilson presented his mitigation case with three types of testimony: testimony by Wilson's friends and former teachers; testimony by Dr. Reynolds, who examined and evaluated Wilson; and testimony by Patricia Taylor, Wilson's mother.

The defense's first witness was Carla Wagoner. Id. Wagoner testified that she came to court because she wanted to be there for Wilson. Id. at 7. Wagoner knew Wilson through church and was a friend of the family. Id. at 8. Wagoner testified that Wilson was always a sweet child, and was never disrespectful. Id. at 9. She testified that Wilson went to church regularly. Id. at 10. She spent holidays with the family and described them as "happy-go-lucky." Id. She considered Wilson intelligent and thought that he had good verbal skills. Id. at 10-11. When asked about Wilson's conviction and the pictures of the murder scene, Wagoner stated that it wasn't the Wilson she knew. Id. at 11. She stated that "the Mike that I knew, I didn't feel like he was capable of doing that." Id. She had never seen Wilson act in a violent manner. Id. She testified that she thought "if given a chance, Michael could turn hisself [sic] around." Id. at 13. The state cross-examined Wagoner. Id. In response to counsel's inquiry as to whether Wilson's conviction would change her opinion of him, she replied "[n]o because that's not the Michael I knew." Id. at 15.

The defense's next witness was Larry Morris. Id. at 16. Morris was, and is, a probation officer for United States District Court for the Northern District of Oklahoma. Id. at 18. Morris had known Wilson for thirteen or fourteen years, through church. Id. Morris testified that he knew Wilson to be a personable, outgoing, likeable, and respectful person. Id. at 19. He testified that he never observed Wilson to have a problem following rules or to exhibit violent behavior. Id. at 20. When asked "[t]he Mike Wilson that you know, that you knew back when you went to church -- when he went to church with you, was that the Mike Wilson that would have been involved in

something like [the pictures of the murder scene]?"  Morris replied "[n]ot the Mike Wilson that I know."  Id. at 21.  Morris stated that, in his opinion, Wilson "is an extremely intelligent young man, who I think has the ability to if not benefit -- to articulate his experiences and thereby helping someone else, particularly if he were given a prison sentence."  Id. at 22.  Morris testified that he thought Wilson could help keep others from committing the same acts that he committed.  Id.

The state cross-examined Morris.  Id.  Morris testified that, despite the fact that Wilson had been convicted of dragging a man to a cooler and that man was beaten to death with a baseball bat, Morris still thought that Wilson was respectful and polite.  Id. at 24.  Morris testified it would surprise him to learn that Wilson had weapons in his possession "[b]ecause that's not the same Michael Wilson that I know from Sunday morning, Sunday school, and Wednesday night prayer services."  Id. at 25.

The defense's next witness was Gene Barnes.  Id. at 26.  Wilson was one of Barnes's students when Barnes was a classroom teacher at Central High School in Tulsa, Oklahoma.  Id. at 29.  He testified that "[t]he Michael Wilson I knew as a student back in, I suppose, '90, '91 . . . was a good student."  Id.  He testified that, based on the time in which he knew Wilson, his life should be spared.  Id. at 30.  He testified that Wilson was respectful and that he "had a positive effect on other students.  And in particular the young man, who went to the State capital with Mike at the time in which he participated in [a school program] . . . ."  Id. at 31.  When asked, after viewing pictures of the crime scene, whether that was the Wilson he knew, Barnes replied "no" and "[t]hat's not the student I knew."  Id. at 32.

The state cross-examined Barnes.  Id.  Barnes agreed that he had not seen Wilson since 1991, and in six or seven years, a person could change.  Id. at 33.  Barnes testified that he would be

surprised to learn that Wilson had weapons on his person when stopped by police officers because "the young man I knew did not exhibit any of those traits or qualities when I knew him." Id. at 35. He testified that Wilson's murder conviction did not change his opinion of Wilson. Id.

The defense's next witness was Ed White. Id. at 36. Wilson was one of White's students at two different schools. Id. at 38. White testified that Wilson was a very good student, intelligent, and someone who "accepted a challenge in doing his work." Id. He testified that Wilson was influential with some of the people in class who had less respect for authority than Wilson did. Id. at 39. When asked how he felt about Wilson's conviction and pictures of the crime scene, White replied "I think it's unfortunate, it is not the Mike that I knew." Id. When asked "are you disappointed in him," White replied "I'm disappointed in not knowing all the particulars of something like this. Because here again, it appears to be two different people that you're talking about." Id. at 40. He testified that he never could have imagined having to take the stand to try to save Wilson's life. Id. at 42.

The state cross-examined White. Id. White testified that, between junior high school and senior high school, White was "essentially the same person that I had met earlier, just a little bit more mature and still self-motivated." Id. at 44. White agreed that he never had any contact with Wilson outside of an educational setting. Id. When asked whether it would surprise him or change his opinion of Wilson to learn that Wilson was found with weapons on his person in 1992 and 1993, White replied "[i]t would surprise me. This is not the Mike that I knew." Id. at 46-47. He also testified that Wilson's convictions for accessory to murder in 1994 and first degree murder and robbery with a dangerous weapon surprised him. Id. at 47.

The defense's fifth witness was Dr. Reynolds.  Id. at 48.  Dr. Reynolds is a clinical psychologist in private practice in Tulsa, Oklahoma.  Id. at 50.  He is a psychotherapist engaged in the treatment of mental disorders, and does psycho diagnostic evaluations.  Id. at 51.  Dr. Reynolds performed an evaluation of Wilson.  Id.  Dr. Reynolds also reviewed Wilson's medical records from the Hillcrest Medical Center, Wilson's school records, records from Children's Medical Center, and statements by White, Pam Johnson, Morris, Larry Williams, and Wagoner.  Id. at 52.  Reynolds also interviewed Patricia Taylor, Wilson's mother.  Id.  He was also made aware of Wilson's criminal and social history.  Id. at 53.

Reynolds met with Wilson on three occasions: January 22, January 29, and February 6, 1997, each time at the Tulsa County jail.  Id.  Reynolds administered two personality tests to Wilson: the MMPI-2 and the MCMI-3, as well as the Slosson Intelligence test, the Bender Gestalt, and the Memory for Designs tests, which screens for organic brain damage.  Id. at 54.  Reynolds also interviewed and observed Wilson.  Id.

Reynolds testified that the result of the intelligence test was that Wilson has an IQ of approximately 126, which puts him in the superior range of intelligence.  Id. at 55.  Reynolds testified that the fact that the test was administered after Wilson had spent two years in prison might have affected his test score.  Id. at 56.  Reynolds testified that the Bender Gestalt and the Memory for Designs tests were normal, and showed no organic brain dysfunction.  Id.  He testified that the MMPI-2 and MCMI-3 tests showed Wilson "experiencing a severe mental disorder with many of the personality scales elevated.  That would suggest that he has a severe personality disturbance."  Id. at 56-57.  He explained that this meant that Wilson "has some very unusual, bizarre types of thinking.  That would suggest that at times he's not or has not periodically been in touch with reality.

That he basically does not necessarily function at times in a normal state, but that he has a great deal of emotional pathology." Id. at 57.

Reynolds testified that the most remarkable parts of Wilson's social history were the statements that people "never would have suspected that Mr. Wilson would have engaged in this type of behavior. . . . [N]o one seemed to have any indication that he would engage in the types of behavior that he did. And then on the other hand, the psychological tests show that he has that propensity to engage in that type of behavior. And so there's a big conflict in terms of what people observed of him and maybe what was going on inside of him. The -- the tests are indicative of severe disturbance, which would correlate with what his behavior was. But what people observed was very something [sic] different, which then indicated to me as a psychologist that Mr. Wilson tends to hide his feelings. He has a very difficult time showing them. He tends to keep everything pretty much to himself. And that, in essence, what was going on inside of him was very different than what he showed the people outside of him." Id. at 58.

Reynolds testified about how Wilson's upbringing and home situation gave "two pictures of Mike. On the one hand, you have the picture of the Sunday school-going child. On the other hand, you have the picture of the gang and the uninvolved father, who did not set a particularly good role model." Id. at 60. Reynolds stated that "the environments to which he was exposed to [ ] explain somewhat [ ] the two types of Michael's [sic] that you have, depending where he was at as to who he identified with." Id. at 60-61.

Reynolds testified that Wilson's observation, as a young adolescent, of a fight and being shot in a drive-by shooting was very traumatic and impacted Wilson significantly. Id. at 61. He also described an incident where Wilson's home was set on fire by a rival gang. Id. at 61-62.

Reynolds testified that Wilson's high intelligence score was significant because it provides him "with the intelligence to do something with himself, as well as be a contributor to others in terms of understanding his world, understanding what he's done, what other persons have done. And therefore, with this level of intelligence, he has the ability to make contributions that may be helpful to those who have lesser intelligence." Id. at 63.

The state cross-examined Dr. Reynolds. Id. at 64. Reynolds agreed that there are psychopathic criminals who have superior intelligence, and that such intelligence could make them better criminals. Id. at 65. However, Dr. Reynolds testified that Wilson was not a psychopath. Id. Reynolds agreed that a nineteen-year-old with superior intelligence knows right from wrong. Id. at 66. Counsel and Dr. Reynolds discussed criticisms of the Slosson intelligence test and the relative merits of the WAIS/R intelligence test. Id. at 67-68.

Reynolds admitted that the computer-generated report of the MCMI-3 test stated that "the guiding principle of this man . . . is to outwit others, exerting power over them before they can exploit him." Id. at 69. The report also stated that Wilson "is easily provoked" and "may express sudden and unanticipated brutality." Id. at 70. Counsel and Reynolds discussed criticisms of the MCMI-3 test. Id. at 72-73.

Reynolds agreed that, without treatment, Wilson would represent a continuing threat to others. Id. at 75. Reynolds was not aware of whether Wilson could receive his recommended treatment in prison. Id.

Reynolds stated that some of Wilson's characteristics, particularly the sharp contrast between witnesses' observations of Wilson when he was younger and his being a completely different person

than they knew could be consistent with the characteristics of a psychopath.  Id. at 76.  Finally, Reynolds agreed that past violent behavior is the best predictor of future violence.  Id. at 79.

On redirect examination, counsel and Dr. Reynolds discussed the fact that psychological tests are often or always critiqued by others in the field.  Id. at 79.  Reynolds testified that he did not rely on any one test in evaluating Wilson.  Id. at 81.  Reynolds testified that the "most classic example" of severe mental disorder in Wilson was his "true" response to the statement "sometimes I feel crazy-like or unreal when things start to go badly in my life."  Id. at 82.  Reynolds testified that he believed that the severe disorder that Wilson's test results described was treatable.  Id. at 84.  He stated that Wilson's higher level of intelligence increased his probability of recovery.  Id.  He testified that Wilson would do well in a structured environment and that, based on his intelligence, he could be beneficial to others.  Id. at 85.

The defense next called Patricia Taylor, Wilson's mother.  Id. at 88, 90.  Taylor spoke about Oscar Wilson, Michael Wilson's father.  Oscar Wilson was not present, even though he lived in Tulsa and knew that Michael was on trial.  Id. at 91.  She testified that Oscar Wilson used crack cocaine in the house while Michael was growing up, and that Michael knew it.  Id. at 92.  Taylor described the relationship she had with her son.  She described it as loving.  Id. at 93.  She described a typical Sunday in her household.  Id. at 94.  She stated that she and Wilson would have a fight on Saturday night about what he would wear to church on Sunday.  Id.  She would wake up and "then Michael and I tussle about waking up."  Id.  They would eat breakfast and have a family prayer before heading to Sunday school.  Id.  She described how hard it was since Michael had been incarcerated, and what she had to go through to visit him in prison.  Id. at 95.  She stated that Oscar rarely went to visit Michael in jail, even when Oscar was staying across the street.  Id. at 97.

Taylor testified to calling Ken Makinson, an investigating police officer, to "come get these things off my front porch." Id. at 98. "These things" were two bags and a bat, evidence in the case. Id. at 99. She turned them over to the police because she thought it would help Michael in the long run. Id. She testified that Wilson never told her where the evidence was. Id. at 99. She stated that she did not want to state where she found the evidence "because if I tell them where I found it, he'll subpoena me later to testify at my nephew's trial." Id. at 100.

Taylor described the conversation she had with her son the morning of the murder. She stated that he came home around six in the morning and yelled at her. Id. He didn't sound quite right, and she asked him what was wrong. Id. at 101. He climbed into her arms and said "Mom, pray with me" and "I need some prayer, mom. I need some right now." Id. She said she didn't understand, and he said "just pray with me." Id. He said "Mom, the QuikTrip was robbed" and "Mom, and the man is dead." Id. She asked what happened and he said "Mom, I don't know. I don't know. Just pray with me." Id. She said "[w]e must get to church and ask God to forgive." Id. They went to church that morning. Id.

Taylor stated that she would visit her son regularly if he were given life in prison without parole. Id. at 102. She also said that she would do "anything under the stars" to save his life. Id. The defense rested. Id. at 103.

### 3. Second stage closing

The state made its closing argument. Feb. 20, 1997 Tr. at 19. Counsel emphasized that "[t]his punishment stage really comes down to two things, aggravators versus mitigating circumstances." Id. at 20. He argued that the state had established the three aggravating factors beyond a reasonable doubt. Id. at 24. He also argued that the defense's character witnesses were

mostly people who hadn't seen Wilson since 1991. Id. at 25-26. He emphasized that no evidence was presented regarding the way Wilson acted around his friends or peers. Id. at 26. He submitted that the mitigating circumstances were just an excuse, rather than a "justifiable reason for beating a man's brains to death." Id. He summarized some of Dr. Reynolds' testimony, emphasizing that Reynolds stated that Wilson had psychopathic tendencies. Id. He questioned why Wilson and the others did not just shoot the victim, rather than beating him with a baseball bat. Id. at 28. He questioned why Wilson chose the QuikTrip at which he worked and a victim that he knew, and suggested it was because Wilson had psychopathic tendencies and was indifferent to the effects of his actions. Id. He suggested that Wilson was playing with the victim when he asked Yost, fourteen minutes before the murder began, "hey, how long are you going to work at QuikTrip?" Id. at 29.

Wilson's counsel made a closing argument. Id. at 31. He argued that the state had not shown that Wilson was in the cooler or wielded the baseball bat. Id. at 32. He emphasized that Wilson is a human being, not "defendant," "psychopath," or other labels. Id. at 35-36.

Counsel argued that Wilson has good character and that he is highly intelligent. Id. at 36. He argued that these characteristics could be used to keep other people from doing the same thing. Id. He argued that Wilson showed remorse when he asked his mother to hold him the morning after the murder. Id. Finally, he asked the jury "to give my client the rest of his life to regret his actions and do not kill him. Do not kill him." Id. at 37.

Defense counsel argued that the mitigation case was what the jury needed to consider. Id. at 40. Counsel stated that he hoped to convey that there is some potential for Wilson in the future, that there is a reason for him to live, and to get the jury acquainted with how he was raised and the things that had impacted his life. Id. at 42. He stated "we think that the evidence shows that this

24

man is capable of reform. He is capable of doing something good at some point in time with his life. We think that we've shown that he's capable of that, because we believe that we've shown through evidence that that has been the case at times during his life." Id. at 43. He argued that Wilson has done well in a structured environment and has the potential to do well in the structure of the penal system. Tr. at 43. Finally, he stated that "an intelligent person who has the capacity to do good can be of benefit to society." Id. at 44.

In rebuttal, the state argued again that Wilson is a psychopathic killer. Id. at 46. Counsel stated "one minute he's crawling in his momma's arms, a few hours later he's buying brand new tennis shoes with stolen money. Pretty scary." Id. at 46-47. He argued that Wilson did not show remorse after the murder. Id. at 47-48.

The jury found that the murder was especially heinous, atrocious, or cruel. Id. at 55. The jury found that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. Id. at 55-56. The jury found the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Id. at 56. The jury fixed Wilson's punishment at death. Id. at 56, 58-59.

### B.    Evidentiary hearing testimony

At the July 28, 2010 evidentiary hearing before this Court, the parties agreed to the filing of a joint stipulation regarding the admission of multiple exhibits. July 28, 2010 Evid. Hr'g Tr., Dkt. # 79, at 16 (hereinafter "Evid. Hr'g Tr."); see also Dkt. # 76, attachment 1.[6] The first witness to testify was Dr. Reynolds.

---

[6]    The Joint Stipulation is attached to Dkt. # 76. Petitioner's exhibits are filed as Dkt. # 87. Respondent's exhibits are filed as Dkt. # 88.

Dr. Reynolds testified that he was hired by defense counsel Robertson in 1997 to perform a psychological evaluation of Wilson to be used at the second stage of trial. Id. at 17. He was not told the mitigation strategy in advance, but understood he would be asked to testify about Wilson's mental state and whatever the data presented. Id. at 19. He testified on February 19, 1997. Id. at 22.

He stated that the first time he saw Wilson was January 22, 1997, at the Tulsa County Jail. He did not remember exactly when he was first contacted by defense counsel, but believed it was shortly before January 22nd. Id. at 23. He was provided certain materials by attorney Robertson, which included statements from Ed White and Pam Johnson (both teachers), Larry Morris (a church friend), Larry Williams (a church friend), some school records, and medical records from Hillcrest and Children's Medical Center. Id. at 25. The records were not provided before he met with Wilson, but he had them before he testified. Id. at 29.

As he had testified at trial, Reynolds stated that he performed the MCMI-3, the MMPI-2, the Slosson Intelligence Test, Bender Gestalt Memory for Design, and a social-psychological questionnaire on Wilson. Id. at 25-26. He stated that the tests revealed no organic brain damage. He met with Wilson three times at the jail. The first meeting was in a private cell, but the next two meetings occurred in the hallway with inmates passing by and very little privacy. Id. at 35. They were held on January 29 and February 6, 1997. Id. at 38. He met with trial counsel on January 30, but did not remember what was discussed. He stated that they did not discuss strategy. Id. at 39.

At the February 6 meeting, Reynolds administered the MMPI-2 test, which he later concluded was invalid. Id. at 40. Although he did not remember exactly when he received the test results, he stated it was "right prior probably to trial." Id. at 42. When he got the results he knew that Wilson had a severe disturbance. Wilson had reported hearing voices and being possessed. Id.

Reynolds met with trial counsel on February 17 and believes he told Robertson that the MMPI-2 test was invalid, but there was important information that was not totally supported by the MCMI-3 test. Id. at 44. He concluded that further investigation was necessary. Id. at 44. Although he had no specific memory of the details of his meeting with Robertson, Dr. Reynolds is sure he would have told the attorney that the MMPI-2 was invalid, the only reliable information was from the MCMI-3, and that further investigation was necessary. He did not ask the attorney to seek a continuance, nor did he recall if he told Robertson what additional testing would be helpful. Id. The results of the MCMI-3 test revealed a severe personality disturbance. Id. at 46.

Dr. Reynolds testified that, based on information from collaborative sources gathered after trial and testing conducted for appeal purposes, his present diagnosis of Wilson is that he has a schizophrenic paranoid personality disorder. Id. at 49-50. When asked how he thinks his more recent definitive diagnosis might have affected a jury if he had testified about it at trial, Dr. Reynolds stated he believes it would have helped the jury understand how Wilson's actions and motivation were influenced by his mental illness. Id. at 50.

Reynolds stated that if asked at trial to explain further details about his diagnosis of severe personality disorder he would have responded that he needed to conduct more testing. Id. at 59. He also stated that Wilson's mental illness was not presented to the jury in a way that they could understand his illness because he was not asked to discuss the various mental disorders underlying Wilson's mental illness. Id. at 66-67.

After the trial, Reynolds was contacted by Wilson's appellate counsel and asked to perform an additional MMPI-2 on Wilson. Id. at 72. After administering the test on March 12, 1998, Reynolds diagnosed Wilson as having a "paranoid schizophrenic disorder." Id. at 73. He supported

the diagnosis through interviews with Wilson's mother, brother James, and girlfriend Tonya Holt. Id.

Reynolds testified that he was given additional medical records for Wilson by appellate counsel, and that such records would have been helpful if he had seen them before trial. Id. at 75. He also reviewed affidavits of Wilson's sister and mother that he said would have been helpful if he had them before trial. Id. at 79-80. The affidavit from Wilson's mother referred to voices that Wilson sometimes heard, but Reynolds did not know about the voices prior to trial. Id. at 80.

Reynolds stated that some of the components of his final diagnosis of paranoid schizophrenia included diagnoses of PTSD (posttraumatic stress disorder), bipolar disorder, and GAD (generalized anxiety disorder). He testified that several traumatic events in Wilson's life may have contributed to his mental illness, including being shot in a gang-related incident, having his family home burned to the ground, and having a close friend and role model die of cancer. Id. at 84-85. Considering the collateral data he obtained in the appeal process, Reynolds stated that there was different picture of Wilson than the one that was presented to the jury at trial. Id. at 87. He stated that he did not have the ultimate diagnosis ready at trial because of the invalid MMPI-2 and the lack of collateral information he gained later. Id. at 89.

On cross-examination, Dr. Reynolds stated that he had reviewed the videotape of the crime and acknowledged that Wilson appeared to be engaged in logical, goal-oriented behavior throughout the tape. Id. at 105-107. He also stated that he had no specific recollection of telling trial counsel that he needed more time to go back and conduct a second MMPI-2 in order to obtain a valid diagnosis. Id. at 122

Wilson's trial counsel, Joe Paul Robertson, was the next witness. While employed at Oklahoma Indigent Defense System (OIDS), Robertson was assigned to be Wilson's trial counsel. He engaged the services of Kent Hudson as second chair counsel. Id. at 129. Robertson had little recollection about specific dates, conversations, and trial preparation but did not dispute any of the information that was shown in the record. He testified that he did not have any files related to Wilson's case so did not review any files prior to his testimony other than his own deposition testimony from a few weeks before. Id. at 132. He also read parts of the transcript of Dr. Reynolds' second stage testimony on his way to the hearing. Id. at 134.

Robertson had tried seven or eight capital cases prior to Wilson's trial. Id. at 135. Although typically done, he had no specific memory of pretrial coordination with attorney Hudson regarding the knowledge or testimony of lay witnesses that might be helpful to Dr. Reynolds. Id. at 136. He testified that OIDS investigator, Steve Leedy, conducted the social background investigation of Wilson. Id. at 137. Robertson did not specifically remember when he started preparation for trial. Id. at 138. He said the investigators are assigned the cases initially, and they usually have contact with witnesses before the attorneys do. He reiterated that, because it has been 13 years since Wilson's trial, he has few specific memories about the trial preparation. Id. at 139. He stated that Leedy did make contact with family members but he had no idea when. Id. at 140.

Robertson acknowledged that the records indicated that requests for Wilson's medical and school records were authorized in 1995, but not made until January 1997. Id. at 145-46. He also acknowledged that waiting two years to seek Wilson's records would not comply with ABA standards. Id. at 147.

Although he had no independent recollection of the decisions made in pretrial preparation, Robertson stated that he was sure that a decision was made early on that the defense needed to be geared toward second stage in an attempt to spare Wilson from the death penalty. Id. at 149. He stated that Debbie, an administrative assistant, wrote letters requesting records and interviewed witnesses. Id. at 150.

Robertson testified that OIDS had very limited funds for expert witnesses at the time of Wilson's trial, and he was not to submit requests for expert services unless he "absolutely knew a case was going to trial." Id. at 154. When asked by the Court about the prospect of a plea in Wilson's case, Robertson said it was possible but he doesn't remember when he knew for sure that he would be going to trial. He does not remember when he began preparing for the mitigation stage. Id. at 155. Although he has no specific memory of the meetings, Robertson does not quarrel with the record, which indicates he met with Dr. Reynolds three times.

When asked about his strategy or theme of mitigation, Robertson stated that part of the strategy was to portray Wilson as an intelligent man who would do well in a structured environment and could be rehabilitated. Id. at 158. When asked if Dr. Reynolds requested more time for additional testing, he did not remember such a request but did recall that Reynolds asked for better conditions, more conducive to testing Wilson. Id. at 160.

Robertson did not remember how he prepared Dr. Reynolds for his testimony, but testified that it was his practice in 1997 to review an expert's findings with him. Id. at 160-61. He did not remember making a strategic decision not to have Dr. Reynolds testify about particular diagnoses. Id. at 161. He did not remember making a strategic decision not to have Dr. Reynolds testify about

posttraumatic stress disorder, bipolar disorder, or generalized anxiety disorder. He did remember there were indications of sociopathic findings that he did not want to get into. Id. at 165.

Robertson testified that he did not remember Reynolds telling him that some of the test results were invalid or asking for more time to do testing. Id. at 166-67. He stated that OIDS placed limits on what could be spent on experts. Id. at 168.

The state cross-examined Robertson. When asked about administrative assistant Debbie's involvement, Robertson testified that she assisted in many ways but did not make strategic decisions. Id. at 174-75. His general practice was to consult with co-counsel and the investigator regarding strategy. Id. at 175-76. When asked about a letter Robertson wrote requesting final payment for Dr. Reynolds in which he wrote "I waited until the last minute in this case," Robertson said he had learned that the prosecutor's wife was a licensed clinical psychologist and he waited to turn over the raw data concerning Wilson's mental illness as long as possible. Id. at 178. When asked about file notes from the investigator, Robertson testified that he remembered Wilson's mother was cooperative, the father was a "problem area," and the brother was in prison. Id. at 184. He did not remember the sister, Staci Faenza. Id. at 185. He remembered that there were some problems with the girlfriend, Tonya Holt, because of suggestions of gang involvement. Id. He did not remember her being a cooperative witness. Id. at 187.

On redirect examination, Robertson acknowledged that he never had any information that Dr. Reynolds made a medical diagnosis that Wilson was a psychopath, even though he used that term in a letter in which he was trying to get Dr. Reynolds paid. Id. at 190-91. He also acknowledged that waiting until he was absolutely certain Wilson's case was going to trial before employing an expert was not advantageous to his client. Id. at 192.

Co-counsel Kent Hudson was the third and final witness. He stated that he had been an attorney for approximately two years when he commenced work as second-chair on Wilson's case. Id. at 194. It was his first capital murder trial and he was engaged to help prepare for the second stage proceedings. Id. at 195-96. He was responsible for the lay witnesses in the second stage, and was not involved with the expert witness. Id. at 198. He did not have any discussion with attorney Robertson regarding Wilson's mental health issues and did not meet with Dr. Reynolds. Id. at 199. He was primarily contacting prospective witnesses to see if they would come and say positive things about their relationship with Wilson, to show that he had a life that was of value to them, and that they would ask the jury to spare him. Id. at 201. He did not ask any of the witnesses about Wilson's mental health history. Id. at 202.

On cross-examination, Hudson stated that he had nothing to do with Reynolds' testimony. Id. at 204. He stated that he attended the trial, sat next to Wilson, and "would have made significant attempts" to humanize Wilson to the jury. Id. at 213. While the crime scene video was played, Hudson told Wilson to look at the floor and show some sort of remorse or embarrassment because he knew the jury was watching. Id. at 215. Hudson testified that minutes later, Wilson leaned over and asked Hudson how he was doing. Id. at 216. He stated that Wilson was a cooperative client, could answer questions, and provide coherent answers. Id.

On redirect, Hudson stated that he did not have an opinion about the status of Wilson's mental health, one way or the other. Id. at 218

### C.     Evidentiary hearing exhibits

In his effort to establish ineffective assistance of counsel, Wilson points to affidavits from various witnesses to support his claim. The following is a summary of those affidavits:

1.  October 8, 2010 affidavit of attorney James C. Bowen, in which Mr. Bowen states that he worked on Wilson's case for approximately two and one-half to three and one-half months, assisting attorney Robertson by preparing motions and attending Wilson's sentencing hearing. He was not responsible for any second stage work except as it related to motions. Dkt. # 80, attachment 1.

2.  March 31, 1998 affidavit of Dr. A. Eugene Reynolds, in which he describes his first examination of Wilson, including the three visits to the Tulsa County Jail in 1977, the records he was provided for review, and his professional opinion rendered prior to trial. Reynolds also described the post-trial battery of tests he administered to Wilson, after which he concluded that Wilson "meets the criterion for a diagnosis of schizophrenia, paranoid type since there is the presence of delusions, auditory hallucinations and a relative preservation of cognitive functioning and affect." In conclusion, he opines that his testimony could have been improved upon enormously had he been provided with the additional information provided by appellate counsel, and that it may have helped the jury "better understand Michael's emotional illness and how he could have participated in the crime." Dkt. # 80, Ex. 1.

3.  March 20, 1998 affidavit of Wilson's mother, Patricia Taylor. She states that Wilson suffered from asthma attacks, severe allergies, and headaches while growing up. He had nightmares as a teenager, and would wake up in a sweat following episodes of talking and fighting in his sleep. Because he didn't remember these episodes of "combative sleep" the next day when asked about them, Wilson's mother wondered if he had been sleepwalking. She described periods when it was very difficult to get through to him because he was looking "right through you." She said he was depressed and "super sad" on several occasions, and felt responsible for his father's drug use and the burning of their family home by the Crips gang. When they moved into some apartments where there was gunfire at least two times a week, she sent him to North Carolina to stay with his sister, Staci, because she was concerned about his environment. She stated that the defense investigator never came by to discuss her testimony with her before trial, and she testified without any preparation. She would have been willing to testify to the facts in the affidavit if she had been asked. Dkt. # 80, Ex. 2.

4.  March 26, 1998 affidavit of Tonya Holt, Wilson's girlfriend and the mother of his child. She explained how Wilson had been the victim in several violent incidents; how he would wake up in the night sweating; that he lied to her about his father being dead; that he had terrible headaches. She also stated that she wondered if Wilson had blackouts or memory problems; that he would introduce himself with a different name; that sometimes it was difficult to follow a conversation with him because he would change the subject abruptly; that he sometimes could not sit still and always seemed "real fidgety." She believed Wilson was a follower rather than a leader. She knew he was beaten while in jail. She stated that she

waited in the hallway every day during Wilson's trial, was willing to testify had she been asked, and would have asked the jury to spare his life. Dkt. # 80, Ex. 3.

5.  March 25, 1998 affidavit of Wilson's older brother, James Leon Wilson. The brother explains that he was a gang member and Wilson was surrounded by gang violence, always trying hard to fit in. He also described the frequent headaches suffered by Wilson. He stated that Wilson seemed to be depressed at times, lost interest in activities he had previously enjoyed, would change conversations midstream, and sometimes forgot events shortly after they occurred. He stated that Wilson had "two distinct personalities" - one loving and cheerful, but the other his "gang face." The brother said that no attorney or investigator from Wilson's trial defense team ever contacted him, but he would have been willing to testify if asked. He would have asked the jury to spare Wilson's life. Dkt. # 80, Ex. 4.

6.  March 27, 1998 affidavit of Wilson's older sister, Staci Faenza. Wilson stayed with Faenza in North Carolina when he was 17. At that time she noticed he had "fighting nightmares" at least three to four times a week. After the nightmares he seemed unable to think or express himself. She explained how their father was a crack addict and was in and out of jail, their brother was involved in gangs and drugs, leaving Wilson with no male role model to lead him. She recalled an incident when Wilson told school personnel that his mother was white. She described the asthma attacks, painful headaches, bad sinuses and nose bleeds suffered by Wilson when he as growing up. She stated that Wilson became suspicious and paranoid after he joined a gang, was subjected to daily violence and was present when some of his fellow gang members were killed. She described other incidents relating to Wilson's gang involvement, and stated she would have been willing to testify at trial but was never contacted. In addition to providing background information about Wilson's childhood, she would have asked the jury to spare his life. Dkt. # 80, Ex. 5.

In addition to the affidavits, both parties presented other exhibits to support their respective positions and used the documents while questioning the witnesses. See Dkt. ## 87, 88. All exhibits described in paragraphs 1-7 of the Joint Stipulation (Dkt. # 76, attachment 1) were admitted without objection. Evid. Hr'g Tr. at 3-4. Those exhibits include, among other things, documents from Dr. Reynolds' file generated in connection with his work for Wilson's trial counsel, documents from Dr. Reynolds' file generated in connection with his work for Wilson's direct appeal counsel, documents from attorney Joe Robertson's file, and Dr. Reynolds' curriculum vitae. See Dkt. # 76, attachment 1.

## D.    Analysis of alleged deficiency

Relying heavily on the 1989 ABA Guidelines, Wilson asserts that his trial counsel's second stage representation clearly fell below an objective standard of reasonableness.  He argues that his trial counsel should have complied with the following standards in his representation of Wilson at the second stage, but did not:

> Guideline 2.1 Number of Attorneys Per Case
>
> Guideline 3.1 The Legal Representation Plan
>
> Guideline 5.1 Attorney Eligibility
>
> Guideline 6.1 Workload
>
> Guideline 11.2 Minimum Standards Not Sufficient
>
> Guideline 11.3 Determining that Death Penalty is Being Sought
>
> Guideline 11.4 Investigation
>
> Guideline 11.8.3 Preparation for the Sentencing Phase
>
> Guideline 11.8.6 The Defense Case at the Sentencing Phase

See Dkt. # 80 at 3-6. Citing Rompilla v. Beard, 545 U.S. 374 (2005), and Wiggins v. Smith, 539 U.S. 510 (2003), Wilson contends that his counsel's failure to adhere to the ABA Guidelines constitutes deficient performance under Strickland. Respondent argues that Wilson places too much reliance on the ABA Guidelines and that counsel's alleged deficient performance must be judged on the particular facts of the case (Dkt. # 83 at 33). The Supreme Court has repeatedly addressed the parameters for reliance on the ABA Guidelines, even in the 1984 Strickland case:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range

of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See United States v. Decoster, 199 U.S. App.D.C., at 371, 624 F.3d, at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Strickland, 466 U.S. at 688-89. See also Rompilla, 545 U.S. at 400 ("while we have referred to the ABA Standards for Criminal Justice as a useful point of reference, we have been careful to say these standards 'are only guides' and do not establish the constitutional baseline for effective assistance of counsel" (quoting Strickland)); Wiggins, 539 U.S. at 543 (quoting Strickland language that the ABA Guidelines "are only guides"); see also Duty v. Workman, 366 Fed. Appx. 863, n.5 (10th Cir. 2010) (unpublished) ("to the extent Duty argues a failure to comply with the ABA Guidelines will, in every instance, result in ineffective assistance, he is wrong").

The Court agrees that Wilson's trial counsel did not satisfy some of the standards pronounced in the 1989 ABA Guidelines. Further, the Court accepts that there was possible mitigation information that defense counsel did not uncover, and that such information would have altered the mental health diagnosis and trial testimony of Dr. Reynolds. There are, however, "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. Counsel's performance must be "completely unreasonable" to be constitutionally ineffective, "not merely wrong." Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997).

A careful review of all the circumstances in Wilson's case reveals that defense counsel's investigation was objectively reasonable, that his decision to emphasize Wilson's high intelligence and potential for reform was reasonable strategy, and that counsel's failure to discover the evidence that Wilson now claims would have altered the jury's decision, did not constitute deficient performance. The failure to present available mitigating evidence is not per se ineffective assistance. Smith v. Workman, 550 F.3d 1258, 1270 (10th Cir. 2008) (citing Hale v. Gibson, 227 F.3d 1298, 1315 (10th Cir. 2000), and Boyd v. Ward, 179 F.3d 904, 918 (10th Cir. 1999)). In concluding that defense counsel's representation was not constitutionally deficient, the Court has reconstructed the circumstances of counsel's challenged conduct and has evaluated the conduct from counsel's perspective at the time. Strickland, 466 U.S. at 689.

Wilson's trial counsel obtained sufficient information from co-counsel, the defense investigator, and Dr. Reynolds to make a reasonable decision about strategy at the mitigation stage. He focused that strategy on Wilson's high intelligence and capacity for rehabilitation. Co-counsel Kent Hudson testified at the evidentiary hearing that he was charged with responsibility for helping prepare lay witnesses at second stage. Evid. Hr'g Tr. at 196. He interviewed Wilson's mother and the other four lay witnesses presented by the defense at second stage. Id. at 197. He did not ask any of the witnesses about Wilson's mental health. Likewise, no one volunteered such information. In the many interviews he had with Wilson, and the entire time he sat beside him in the courtroom, Hudson never noticed anything unusual about Wilson's behavior, or noticed anything that caused him to believe Wilson may have had some kind of psychological issue. Wilson never told Hudson that he heard voices or that he suffered delusions. Id. at 214. He described Wilson as a co-operative client who could answer questions in a coherent manner. Id. at 216. In short, nothing in Hudson's

testimony indicates that he knew or should have known that further investigation regarding Wilson's mental health was necessary, or that the mitigation theory should be expanded or changed from an emphasis on Wilson's intellect and potential for reform.

OIDS investigator Steve Leedy and OIDS office administrator, Debbie Keys, also assisted trial counsel in preparing for second stage. According to Robertson's evidentiary hearing testimony, Leedy was charged with obtaining Wilson's social and family history, medical records, school records, and determining if there had been medical or psychological tests done. Id. at 138. Keys assisted in gathering medical and school records. Id. at 143-145. Exhibits and evidentiary hearing testimony showed that, although authorization to obtain Wilson's records was obtained in 1995, Leedy and Keys did not ask for the records from various entities until January of 1997. Attorney Robertson admitted that waiting two years to start seeking the records would not comply with the ABA Guidelines. Id. at 147. Robertson's memory was unclear as to whether Leedy and Keys both may have participated in interviewing the second stage lay witnesses. Id. at 151. A January 21, 1997 memo from Keys summarized the potential testimony of some mitigation witnesses, but nothing in the summary indicates any of the witnesses mentioned Wilson's mental health problems. See Respondent's Evid. Hr'g Ex. 4.

Attorney Robertson testified that he met with Dr. Reynolds prior to the second stage. Although Robertson had few specific memories about his trial preparation of Dr. Reynolds, he testified that based on the interviews he had with Dr. Reynolds before his testimony, he did not have any reason to believe that Wilson had serious mental issues beyond what Dr. Reynolds found. Id. at 163. He also testified that he did not remember anyone other than Dr. Reynolds giving him information with regard to the psychological condition of Wilson. Id. at 180. When asked about the

delayed preparation for second stage and late hiring of Dr. Reynolds, Robertson said there were "budgetary issues" and OIDS had "very limited funds for expert services." Id. at 152-154. He was directed not to submit requests for expert services until he absolutely knew a case was going to trial. Id. at 154. He did not recall Reynolds telling him that some of Wilson's test results were invalid, nor did he remember Reynolds asking for more time for additional testing. Id. at 166-167, 171. He did recall that Reynolds asked for better conditions, more conducive to testing Wilson. Id. at 160. Dr. Reynolds also testified at the evidentiary hearing that he did not remember if he told Robertson what additional testing would be helpful. Id. at 44.

Wilson has not demonstrated that Robertson had any reason to think the mental health information he had was incomplete or that a different mental health diagnosis was possible. He developed a theory of mitigation based on the information he was provided by co-counsel, the defense investigator, OIDS office administrator, and his mental health expert. Under these circumstances, the Court cannot regard counsel's performance as "completely unreasonable." Hoxsie, 108 F.3d at 1246. Although hindsight, post-trial investigation, and additional mental health testing reveal that counsel could have presented a different theory at mitigation, focusing more on Wilson's later diagnosis of schizophrenia, the Court finds that counsel's second stage investigation, preparation, and representation was not constitutionally deficient.

The Court acknowledges that, in the Tenth Circuit's panel opinion, Judge McConnell determined that trial counsel's performance was deficient because of the delay in hiring Dr. Reynolds, the failure to investigate thoroughly Wilson's family background and provide such additional information to Dr. Reynolds, and the failure to present to the jury the diagnoses already made by Dr. Reynolds. Wilson, 536 F.3d at 1092-93. The other two judges on the panel did not join

in that conclusion, but a majority agreed that the case should be remanded to this Court for further consideration and an evidentiary hearing on the ineffective assistance claim. Because there may remain differing opinions about counsel's performance under the deficiency prong of <u>Strickland</u>, the Court will proceed to address the prejudice prong. To establish ineffective assistance of counsel, Wilson must satisfy both prongs of the <u>Strickland</u> analysis. <u>Strickland</u>, 466 U.S. at 687.

## II.     Prejudice

In order for counsel's performance to constitute a Sixth Amendment violation, Wilson must show that counsel's failures prejudiced his defense. <u>Strickland</u>, 466 U.S. at 692. He must establish that, but for counsel's errors, there is a reasonable probability that the result of the second stage proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.  In assessing prejudice, the Court must reweigh the evidence in aggravation against the totality of mitigating evidence, including the additional evidence which Wilson has now presented through his evidentiary hearing. <u>See</u> <u>Wiggins</u>, 539 U.S. at 534. Notwithstanding any borderline issue regarding the deficient performance of trial counsel, the Court is convinced that counsel's performance did not result in constitutional prejudice to Wilson which would entitle him to habeas relief.

When evaluating the prejudicial effect of a claim of ineffective assistance premised on alleged failure to adduce mitigation evidence, the court must "evaluate the totality of the available mitigation evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding - in reweighing it against the evidence in aggravation." <u>Williams v. Taylor</u>, 529 U.S. 362, 397-98 (2000) (citing <u>Clemons v. Mississippi</u>, 494 U.S. 738, 751-52 (1990)); <u>see</u> <u>also</u> <u>Cannon v. Gibson</u>, 259 F.3d 1253, 1276 (10th Cir. 2001) (citing <u>Walker v. Gibson</u>, 228 F.3d 1217, 1234 (10th Cir.

2000) for the rule that in determining whether a petitioner was prejudiced by counsel's failure to present additional mitigation evidence, the court considers the strength of the state's case, the aggravating circumstances the jury found, the mitigation evidence defense counsel did present, and the additional mitigation evidence counsel might have presented)).

The Court begins its analysis with a review of the first stage evidence, incorporated into the second stage for purposes of proving the continuing threat aggravator. Feb. 18, 1997 Tr. at 29-30. The prosecution's first stage case was exceptionally strong. The state presented a surveillance videotape from the QuikTrip which showed the actions of Wilson and his three co-defendants for several hours prior to, during, and after Yost's murder. In the videotape, Wilson can be seen participating in the initial attack on Yost, then going behind the store's counter to wait on customers while the murder is taking place in the back room. Wilson waited on several customers, greeting them normally and selling them merchandise. When customers were not around, he was trying to remove the safe from underneath the counter and taking money from the cash drawer. Wilson confessed to Detective Folks that they had been planning the robbery for two weeks, and he knew Yost would be killed. Wilson's role in the crime was crucial because he was a QuikTrip employee. He knew the work schedules, knew how to work the cash register, knew where the surveillance video was housed, and knew about the safe. The victim's bloody QuikTrip jacket, the baseball bat, and other incriminating evidence were recovered from Wilson's front porch. There was no doubt that Wilson played a key role in the QuikTrip robbery and Yost's murder.

Additional evidence was presented in the second stage in support of the continuing threat aggravating circumstance, as follows: (1) Wilson was awaiting sentencing on a 1994 charge of accessory after the fact to another murder when the QuikTrip robbery and murder was committed

(Tr. Trans. at 54); and (2) just days prior to the QuikTrip murder, Wilson was charged with transporting a firearm because a loaded .25 caliber automatic pistol was found in his vehicle (Id. at 56-57).

Before commencing the process of reweighing the evidence, it is useful to review the jury's second stage findings and the OCCA's treatment of those findings. At the conclusion of the second stage proceedings, the jury found the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. On direct appeal, the OCCA affirmed Wilson's first degree murder conviction and death sentence. Wilson, 983 P.2d at 473. After reviewing the record and "carefully weighing the aggravating circumstances and the mitigating evidence," the OCCA found that the jury's determination that the aggravating circumstances outweigh the mitigating circumstances was "amply supported by the record." Id.

Moving to the process of reweighing the evidence, this Court first finds that none of the additional proffered mitigating evidence would have altered the jury's finding that the murder was especially heinous, atrocious, or cruel, or that it was committed for the purpose of avoiding arrest. Those two aggravating circumstances were clearly established by the prosecution's first stage evidence, which was incorporated by reference into the second stage proceedings. None of the omitted mitigating evidence remotely concerns these two aggravating circumstances. Thus, the additional mitigating evidence might have affected the jury's analysis of the continuing threat aggravating circumstance only.

Wilson fails to provide a convincing argument that he was prejudiced by counsel's second stage representation. Other than making a conclusory assertion that he was prejudiced (Dkt. # 80 at 19) and explaining the standard of proof for demonstrating prejudice (id. at 2), Wilson's only substantive argument concerning prejudice is his assertion that Wilson was not involved in the actual killing of the victim (id. at 31-32). In his reply, Wilson again discusses the standard of proof required of him, contending that he only must show a "realistic possibility of harm." [7] Dkt. # 86 at 8. Without further discussion of the application of Strickland's prejudice prong to the facts of his trial, Wilson concludes that there is a reasonable probability that, absent counsel's errors, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Id. at 10. The Court does not agree.

Counsel's mitigation strategy failed. But the notion that the result would have been different had counsel conducted more investigation, allowed more time for Dr. Reynolds to examine Wilson, and presented additional family witnesses and a different mental health diagnosis through Dr. Reynolds' testimony, is unconvincing. Dr. Reynolds testified at the evidentiary hearing that the additional testing he performed on Wilson after trial enabled him to "pin . . . down a little more definitively" his diagnosis of Wilson's mental health from a "severe personality disorder" to

---

[7] However, the correct standard under Strickland's prejudice prong is that Wilson has the burden to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." Harrington, 131 S. Ct. at 792 (citing Strickland, 466 U.S. at 693, 697).

"schizophrenic paranoid personality disorder." Evid. Hr'g Tr. at 45-50.[8]  Wilson argues that if Dr.

Reynolds' post-trial diagnosis portraying Wilson as "someone who is very seriously disturbed with

a psychiatric diagnostic disorder that is very, very severe" had been presented to the jury, it was

reasonably likely that their decision in the second stage would have been different.   However,

emphasizing Wilson's mental health issues might not have helped Wilson with the jury as much as

he claims. Presenting a diagnosis of schizophrenia may have supported the prosecution's portrayal

of Wilson as a dangerous and continuing threat to society. See e.g., Bryan v. Mullin, 335 F.3d 1207,

1222 (10th Cir. 2003) (noting counsel's concern that mental health evidence might play into the

prosecution's case that Bryan was a continuing threat to society); Cannon v. Gibson, 259 F.3d 1253,

1277-78 (10th Cir. 2001) (noting that mental health evidence has the possibility of being a "two-

edged sword").   As in Bryan and Cannon, it is a distinct possibility that additional mental health

evidence might have been counterproductive and harmed Wilson's mitigation case rather than help

it. Further diagnosis and testimony about Wilson's mental condition would have given the

prosecution additional opportunity to focus on the dangerous characteristics associated with

schizophrenia. The Court cannot conclude that additional evidence of Wilson's mental health

problems would have affected the jury's imposition of the death penalty.

---

[8]     Dr. Reynolds testified at trial that Wilson has a "severe personality disorder." Feb. 19, 1997,
Tr. Tran. at 57. He explained to the jury that Wilson "has some very unusual, bizarre types
of thinking" suggesting that at times he is not, or has not been, periodically "in touch with
reality." Id. He also stated that the tests administered to Wilson are indicative of "severe
disturbance,"  but that Wilson would do well in a structured environment such as prison. Id.
at 58, 85.  In response to the Court's questioning at the evidentiary hearing, Dr. Reynolds
opined that his later, more definitive diagnosis of Wilson's mental health issues may have
helped the jury understand the motivation for what Wilson did and understand that the
motivation may have been driven by his mental illness. Evid. Hr'g Tr. at 50.

Wilson's prejudice argument does not reach the threshold of a reasonable probability, and he has not provided sufficient evidence to carry his burden. He has not shown a reasonable probability that the additional evidence he offered would have changed the balance of aggravating and mitigating circumstances. Given the strong evidence of his guilt, and reweighing the aggravation evidence versus the mitigation evidence, the Court concludes that Wilson has failed to establish prejudice from trial counsel's purported second stage failures and omissions. Habeas relief shall be denied.

## CONCLUSION

Wilson has failed to satisfy either the deficient performance or the prejudice prong of Strickland. As a result, he is not entitled to relief on the ineffective assistance of trial counsel claim before this Court on remand from the Tenth Circuit. Habeas corpus relief shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.    Wilson's motion to expand the record (Dkt. # 81) is **granted**.

2.    Wilson's petition for habeas corpus relief based on ineffective assistance of counsel (Dkt. # 16) is **denied**.

3.    A separate judgment is entered herewith.

**DATED** this 23rd day of February, 2011.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT